[No. 2356.]

## Robert Campbell v. The State.

1. Unlawfully Driving Stock, Etc.—An Ordinary Indictment for Theft will support a conviction for unlawfully taking into possession and driving from its accustomed range the animal of another, without the consent of the owner, and with intent to deprive the owner of its value.

2. Theft—Felony—Misdemeanor—Case Overruled.—Article 749 of the Penal Code, in defining the offense of unlawfully driving stock from its accustomed range, enacts another character of cattle theft than that denounced generally in Article 747 of the Penal Code, but besides providing for it the same terms of confinement in the penitentiary as punishment, it authorizes alternative penalties by fine, or by both imprisonment and fine. *Held*, that the driving of stock from its accustomed range, etc., is but a species of cattle theft, and cattle theft is *per se* a felony notwith-standing the alternative punishment provided by Article 749 of the Penal Code. The position, therefore, that a former trial of the appellant having resulted in his conviction of the theft defined in Article 749, and his punishment at a fine, he can not be again found guilty of theft and awarded a term in the penitentiary as punishment, is untenable. See the opinion on the question, and note that the *contra* doctrine laid down in Sisk's case, 9 Texas Court of Appeals, 90, is overruled.

APPEAL from the District Court of Parker. Tried below before the Hon. A. T. Watts, special judge.

The conviction in this case was for the theft of a heifer, the property of Mary Criswell, in Parker county, Texas, on the seventeenth day of March, 1885. A term of two years in the penitentiary was the penalty assessed by the jury.

Ira Criswell, the brother of the alleged owner of the stolen animal, was the first witness. He testified that his sister owned ten or twelve head of cattle, after which he looked. On the morning of March 17, 1885, while walking about the country adjacent to his mother's residence, where his said sister, Mary Criswell, lived, the witness saw the defendant and his brother, Dan Campbell, riding through his said sister's bunch of cattle, and saw them cut out and drive off the yearling in question. Witness, when he first saw the Campbell boys, was between two hundred and fifty and three hundred yards distant from them, but had approached within one hundred and fifty yards

of them when they drove the yearling off. The Campbells cut the animal out of the bunch in a little flat, and witness watched them until they drove it through some timber and disappeared from his sight over an open knoll. They traveled in a gallop. Witness saw the yearling plainly until it disappeared with its drivers over the knoll, and knew it to be his sister's yearling which he had attended to. Until that night that yearling had always come up with its mother and the other cattle. It was a white and dark red or black pided heifer yearling, unmarked and unbranded. The witness called and hallooed to the Campbell boys, but supposed that they did not hear him.

The witness went home, secured a horse, and went to Blackwell's place, a mile and a quarter from home, where Fayette Blackwell and William Blair were hauling rails, and told them what he had seen the Campbell boys do. He then went to the house of the Campbell boys, where he saw Dan Campbell. He asked Dan where his brother, the defendant was, and told him what he saw the two do with reference to the yearling. Dan replied: "We left that yearling over there." Witness then told Dan to get on his horse and go and show the yearling to him, and he would abandon the search. Dan replied that his horse was tired and he would not go. Witness's brother, Tom, on the second evening after the yearling was driven off by the Campbell's, found it back of Blackwell's place, and near Woods Kirby's place, about one and a half miles from Mrs. Criswell's house, and on the next morning witness and Tom drove it home. Witness had never before seen any of his sister's cattle in that section. The country about there was fenced in, and to get home from there the animal would have had to go around a field. The yearling, when found as described, was fresh marked. No other cattle were near it. The mark in which it was found was a swallow fork and hack in one ear and a crop in the other. It appeared to have been marked two or three days. Witness did not know who owned the mark. Witness was looking for a cow when he saw the Campbell boys, whom he knew well, drive the animal off.

Mary Criswell testified, for the State, that she missed her certain white and red pided heifer yearling on the seventeenth day of March, 1885, and her brothers Ira and James looked for it unsuccessfully for two or three days. On the evening of the second day after its disappearance the witness's brother Tom, on his way home from Patella's, saw the animal behind Black-

well's place, and on the next morning it was driven home by Ira and Tom. When it disappeared the yearling was unmarked and unbranded. When brought back it was fresh marked with a crop off one ear and a swallow fork and hack in the other. The witness at the time was past twenty-one years of age, and was living with her mother. She owned a small bunch of ten or twelve head of cattle, which ran on the range about the house. She had never seen any of her cattle back of Blackwell's farm. No one had the witness's consent to take the yearling in question. It was not a line backed yearling. Witness's brother Ira looked after her cattle for witness.

Jim Criswell, Mary Criswell's brother, testified, for the State, that he know the alleged stolen animal well. It belonged to his sister Mary, and was a white and red or dark spotted heifer yearling, and not a line backed yearling. It customarily came up at night with the other cattle, until it disappeared. It was unmarked and unbranded when it disappeared on March 17, 1885. When recovered on the twentieth of the same month it was fresh marked as described by the previous witness. It was found behind Blackwell's farm, about a mile and a half from home, and where it had never been seen before. The country about Blackwell's was so fenced up that the yearling could not get home without traveling around the Blackwell farm.

Tom Criswell corroborated the testimony of his sister Mary and brother Jim, and added that there were no cattle near the yearling when, on the evening of the second day after its disappearance, he found it behind Blackwell's farm.

Fayette Blackwell testified, for the State, that he and William Blair were hauling rails in his, witness's, field on the day of the alleged theft. While thus engaged, witness saw the Campbell boys, defendant and Dan, driving a red and white pided yearling along or near the public road. He saw them but a short distance, traveling in a gallop, and going in a northwest direction. They were then about two hundred and fifty or three hundred yards distant from the witness. They were driving but the one yearling. Old man Campbell, the defendant's father, lived northeast from witness. Town was a little west of north from his (witness's or old man Campbell's?) house. Mrs. Criswell lived about a mile and a quarter from the witness's house. An hour or two after witness saw the Campbells driving the yearling described, Ira Criswell arrived and had a talk with witness and Blair, and then rode on. Witness did not know Miss Mary

Criswell's cattle. The testimony of this witness was corroborated in every material particular.

Tom Pickard testified, for the State, that he went to the town of Weatherford on the morning of March 18, 1885, the day after the alleged theft of the yearling of Miss Mary Criswell, of which theft he had been apprised. About two miles and a half from town, he saw two men cross the road four hundred or five hundred yards ahead of him, driving a white and red spotted yearling. One of those men, according to the belief of the witness, was the defendant. Witness had known the defendant from his childhood, and, though that man had his back to him, he took him to be the defendant. Witness did not know the other man. The men with the yearling were going from the direction of John Beverly's house, a short distance from where witness saw them, towards Burgess creek, to the northeast. A person traveling from Burgess creek to Criswell's would likely fall in north of the old Blackwell place, where Woods Kirby lived, and where the yearling was said to have been afterwards found. Burgess creek was two or three miles distant from the point where witness saw the two men with the yearling. The Blackwell place was south from Burgess creek, and about five miles distant. Defendant, or the man witness took to be the defendant, was riding a rapid pacing sorrel horse or good sized pony. It was about nine o'clock in the morning when witness saw the men with the yearling.

Tom Cressinger testified, for the State, that he was with constable Hurst on March 18, 1885, when he arrested the defendant. Defendant and Tom Beverly were then together, traveling horseback, and were about four miles from Weatherford. Defendant was riding a fast pacing sorrel pony. Defendant and Beverly were traveling southwest towards Beverly's house. George McCormas, Jim Criswell and William Long were at Beverly's house when witness and Hurst reached there with defendant in custody. The State closed.

John Beverly was the defendant's first witness. He testified that on March 16, 1885, he undertook to drive a cow and her yearling from the range near Mrs. Criswell's to his house. The cow and yearling would not drive together, and witness left the yearling on the range and drove the cow on home. Passing old man Campbell's house, witness left word with him for the defendant to drive the yearling home for him. On the next day, March 17, 1885, defendant drove the yearling to wit-

ness's house, and witness marked and branded it. That yearling belonged to the witness, and was the only yearling ever driven to his house by the defendant. It was a red and white spotted line back heifer yearling.

Cross examined, witness testified that George McCormas lived at his house. Witness and defendant went from witness's house to Burgess creek, on the morning of March 18, 1885, to hunt cattle for the witness. Their route led them across the Weatherford road. They did not find the cattle they went to look for. On their way back, and when near the Haynes farm, they met constable Hurst and Cressinger, who took defendant into custody.

Dan Campbell, the defendant's brother, testified, for the defense, that he had been indicted for this same offense, had been tried, convicted, fined, and had paid his fine.

Witness and defendant, on the day alleged in the indictment, went to the range near Mrs. Criswell's to get a yearling for Beverly which Beverly had left there. They found the yearling in a small bunch of cattle, cut it out, and drove it past old man Campbell's house, where witness stopped, and defendant drove it on to Beverly's house. It was a white and red spotted line back heifer yearling, unmarked and unbranded. They found the animal at about nine o'clock in the morning, and drove it openly along the Weatherford and Granbury road. They saw Ira Criswell just before they got the yearling and he was in sight when they drove it off. They met James Hopkins on the road.

Cross examined, witness testified that the yearling would not drive well, and they drove two of their own yearlings with it until they reached their father's house. They met Hopkins at the head of the lane just before reaching home, at which time they had the three yearlings.

Frank Hopkins, testified for the defense, that while riding along the public road in the lane between old man Campbell's house and the house of Fayette Blackwell, on the morning of March 17, 1885, he met the defendant and his brother Dan driving a red and white spotted line back heifer yearling.

Cross examined, witness said that they had no other cattle than the yearling described, so far as he saw. Witness lived then in Palo Pinto county, and was in the neighborhood hunting a horse for Sam Shadle. He spent the night of that day at John Beverly's house.

James Gibson testified, for the defense, that, on the morning of March 17, 1885, he met the defendant near the house of James Voorhies, driving a red and white spotted line back yearling.

James Blackwell testified, for the defense, that, through the gates from Kirby's house to Mrs. Criswell's the distance was between a mile and a quarter and a mile and a half. To go around the field east, the distance would be about five hundred yards greater. Around the field west the distance was about a mile greater. Witness had often seen the Criswell cattle south of the Blackwell farm, between that farm and Criswell's and east of the Blackwell farm. He had never seen them north of the Blackwell farm in the neighborhood of the Kirby house.

Woods Kirby testified, for the defense, that when he went out to his straw stack to turn out his cattle on the morning of March 19, 1885, he observed a red and white pided heifer yearling standing just outside of his pen. He did not observe it on the night before, though it may have been there. He did not know how it got there or who owned it.

Cross examined, the witness testified that that yearling was fresh marked, but he did not observe the marks close enough to remember them. It was taken away by the Criswell boys. The witness had never seen the Criswell cattle about his place. Burgess creek was north from witness's house, and an animal endeavoring to go from that creek to Criswell's would naturally traverse the country adjacent to witness's house. Burgess creek was about five miles distant from witness's house. The animal could not have passed, unaided, through gates intervening between the houses of the witness and Mrs. Criswell, a mile and a quarter apart. The distance around the field east was a quarter of a mile greater, and much greater around the field west. The defense rested.

George McCormas testified, for the State, in rebuttal, that he was at home at John Beverly's on the morning of March 18, 1885, the day after the alleged theft. John Beverly was not at home, but had gone with defendant on a cattle hunt to Burgess creek. During their absence William Long and Jim Criswell came to Beverly's gate and inquired of witness about the Criswell yearling, and the witness told them that they, meaning the Campbell boys, did not bring the said yearling to Beverly's place. At this point the State asked the witness if he did not then and there tell Long and Jim Criswell that the Campbell boys did not take any yearling to Beverly's on the day before, to which ques-

tion he replied that he did not so tell Long and Jim Criswell. The witness attended this term of court as a witness for the defendant, and was sworn and placed under the rule. He testified as a witness for the defense on the former trial of this cause.

William Long was next introduced by the State in rebuttal. He testified that he helped Jim Criswell hunt the Mary Criswell yearling said to have been driven off by the defendant and Dan Campbell. On the day succeeding the alleged theft, witness, who was acting deputy sheriff of Parker county, and Jim Criswell, went to John Beverly's house and saw George McCormas at the gate. Beverly was not at home. Witness, in the presence of Jim Criswell, told George McCormas that Mary Criswell had lost a yearling, and that defendant and Dan Campbell were accused of taking it. Witness said to McCormas: "George, you know whether they drove any yearling here yesterday or not. Did they?" McCormas replied: "They did not; neither one of them." McCormas was then living with Beverly. In a few minutes, John Beverly, defendant, Constable Will Hurst and Tom Cressinger arrived, defendant being in arrest. They came from the direction of Haynes's farm on Burgess creek.

Cross examined, the witness said that he knew Mary Criswell's yearling. It was a red and white pided heifer yearling, and not a line back. It was unmarked and unbranded. When witness last saw it before its alleged theft, and when he first saw it after its recovery, it was fresh marked, as stated by previous witnesses. When defendant reached Beverly's in custody, he said to the parties present: "Come here, let me show you the yearling Ira Criswell accuses me of stealing." He then pointed to a red and white spotted line back heifer yearling, then in Beverly's lot; whereupon George McCormas said: "If I had known that to be the yearling asked about I could have shown it at first." If that yearling was fresh marked, witness did not observe it.

Jim Criswell, recalled by the State in rebuttal, testified that he was with William Long at Beverly's house on the morning of the eighteenth and heard and saw all that transpired. The witness then corroborated Long circumstantially.

Seven or eight witnesses, called by the State, testified that they were well acquainted with John Beverly's reputation for truth and veracity, and that it was bad. An equal number of witnesses, introduced by the defense, supported Beverly's reputation for truth and veracity as good.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Under an ordinary indictment for theft of an animal, the accused may be convicted of that offense or of wilfully taking into possession and driving from its accustomed range live stock not his own, without the consent of the owner, and with intent to defraud the owner thereof, which is made by statute both theft and a felony. (Penal Code, Art. 749; Foster v. The State, 21 Texas Ct. App., 80; Smith v. The State, Id., 134.)

The indictment in this case was for theft of the animal. Appellant has been twice tried and twice convicted under it. On the former trial he was found guilty of theft and his punishment was assessed by the verdict and judgment at a fine of three hundred dollars. Evidently this verdict and judgment were based upon article 749, of the Penal Code, which provides that, "If any person shall wilfully take into possession and drive, use, and remove from its accustomed range any live stock not his own, without the consent of the owner, and with intent to defraud the owner thereof, *he shall be deemed guilty of theft,* and on conviction shall be confined in the penitentiary not less than two nor more than five years, or be fined in a sum not to exceed one thousand dollars, or by both such imprisonment and fine, at the discretion of the jury trying the case." This statute provides for a character of cattle theft different from that denounced generally in article 747, Penal Code, which declares that, "If any person shall steal any cattle he shall be punished by confinement in the penitentiary not less than two nor more than five years." It will be noted that the punishment prescribed by article 749 is fixed at the same number of years in the penitentiary, and, in addition, the prisoner may be fined in any sum not exceeding one thousand dollars. So the punishment under article 749 may be greater than that imposed by article 747. But in as much as the punishment under the latter article may be simply by fine without imprisonment, this crime is ordinarily considered, and has perhaps been erroneously called, a lesser degree of theft. Whether a lesser or greater degree

makes no difference really, since *it is theft per se,* and made so by the terms of the statute. Being theft, an indictment in the ordinary form of theft of animals is sufficient to cover the crime and admit the proof essential to its establishment.

As stated above, on his first trial, appellant was convicted of theft, under a charge of the court submitting the offense as defined in Article 749, and his punishment was affixed at a pecuniary fine of three hundred dollars. This judgment was set aside and a new trial awarded on his motion. On this second trial, and upon a charge submitting the law in the same manner as to Article 749, appellant has again been convicted of theft, and the punishment now assessed against him by the verdict and judgment is imprisonment in the penitentiary for a term of two years. It is claimed that this judgment is erroneous and unwarranted by law, because, the previous judgment having only imposed a fine, he could not afterwards be convicted to punishment in the penitentiary. In other words, the position contended for is that the former conviction was for a lesser grade of the crime, to wit, a misdemeanor, and that it is a bar to any higher grade, and that defendant could not afterwards be tried, much less convicted, for the felony.

In Sisk v. The State, 9 Texas Court of Appeals, 90, which was a case involving the construction of Article 749, a majority of the court held that "if a defendant be found guilty of an offense punishable by the penitentiary or by fine, and the jury assess his punishment at a fine, the conviction is not for felony but for misdemeanor." If this decision be correct, then appellant's position is impregnable. (Robinson v. The State, 21 Texas Ct. App., 160.)

In a dissenting opinion in Sisk's case the writer differed with the majority of the court, maintaining that there could be no *theft of cattle* which is not a felony under our law. It was said: "Now, what is the distinction made by our law between a felony and a misdemeanor? We find it plainly and unmistakably declared by the Code itself, 'Every offense which is punishable by death *or imprisonment in the penitentiary, either absolutely or as an alternative, is a felony.'* (Penal Code, Art. 54.) It seems to me to follow inevitably that the punishment under Article 749 being alternative, and one of the alternatives being confinement in the penitentiary, any conviction had under its provisions must necessarily be a felony. To hold otherwise, it

appears to me, would be to ignore entirely the statutory definition of felony."

In Alabama, where it seems their definition of felony is similar to ours, it was held, in Clifton v. The State, that "it is the capacity of an offense to be punished by confinement in the penitentiary, and not that such punishment of necessity follows conviction, that distinguishes crime and separates felonies from misdemeanors; and hence the offenses created by statute, falling precisely within the definition of a felony given by statute—a public offense which *may* (not *must*) be punished by confinement in the penitentiary—are felonies, although under the statute persons convicted thereof may be fined, imprisoned in the county jail, or sentenced to hard labor for the county." "If by the terms of the statute," says Mr. Bishop, "the court or jury is at liberty to inflict some milder punishment, instead of imprisonment or death, this discretion, it is held, does not prevent the offense from being a felony. That the *heavier* punishment *may* be imposed is sufficient." (1 Bish. Cr. L. [7 ed.], sec. 619.)

We are of opinion that the majority opinion in the Sisk case should be and it is hereby overruled. The judgment rendered on the first trial of appellant was not a conviction for a misdemeanor, and it could not bar a subsequent prosecution and conviction for felony, with imprisonment in the penitentiary under the statute. (Art. 749, Penal Code.)

There is no other question of sufficient importance to require a discussion. There being no reversible error made to appear on appeal, the judgment is affirmed.

*Affirmed.*

Opinion delivered November 13, 1886.